First case on today's docket is J.P. Morgan Chase v. Datatresury Corporation, cause number 18-40043. Is the appellant ready to proceed? Yes, Your Honor. Appellee? Yes, Your Honor. You may proceed. May it please the Court, good afternoon. My name is Zachary Newman with my colleague Stephen Aquino. On the law firm of Hahn & Hessen LLP, we represent the appellant, J.P. Morgan Chase. Your Honors, we're here to appeal a discovery order. The district court we contend abused its discretion with this particular post-judgment discovery order, and in turn rewarded Datatresury Corporation for its repeated concealed breaches of a contract containing a most-favored licensee provision, and permitted the company in one fell swoop, by virtue of this two-page discovery order, to shield various accountings, transfers, and cash dispositions, and permitted it to hide the dissipation of a half of a billion dollars in revenue while it was in breach of this most-favored licensee provision. The prior court rulings, including, most importantly, a 30-page ruling from this Court, the Fifth Circuit, concluded that Datatresury had, since the 2005 execution of this agreement with J.P. Morgan, had an affirmative, automatic obligation to do two things. One was to notify J.P. Morgan of any favorable subsequent licenses, which it failed to do, and two, to refund J.P. Morgan Chase the difference in the lump-sum license payment that it agreed to in its 2005 agreement and any subsequent agreement. The Fifth Circuit and the original sitting district judge found that Datatresury repeatedly breached this provision, failed to notify J.P. Morgan, and just continued to accept the $70 million of payments from J.P. Morgan. Our question is just, really, the relevance of this earlier discovery period that you want to go. How far do you want to go back? I take it you're trying to identify transfers or whatever, allocation of resources away from the company, whatever. Explain to me what you really . . . you can get. This Court denied you. It cuts you off in 2011 or whatever it was. You want to go back further. I understand that, but what are you looking for that's going to help you? Judge, we are looking to go back to the first breach of the MFL, which was written in the opinions as the NCR Corporation breach in January of 2006. I understand you want to go back, though, to 2006, but my question is, is you want discovery to do what? You have a very large judgment, and you — on his face, it appears that there's no one out there to collect it. We're going to try to find that out. But help me a little bit with what the basis of that is. The district court thought it reasonable just to go back 5 years or so before this judgment. Yes, Your Honor. So the — to answer one of the questions asked, the information being sought. Let me just put it this way. It's kind of a straightforward discovery question post-judgment, and proportionality rules apply to the cost expense versus what you might hope to gain. So that's where I'm coming from. They do, but we contend that there's a different lens of analysis that should be applied post-judgment as opposed to pre-judgment. And we don't think the district judge engaged in — in that appropriately. We think he took too narrow of an approach, and we think he did so primarily based upon arguments made by Data Treasury that were contrary to, directly in contravention of, prior rulings by the Fifth Circuit and the district court. But you have a judgment which focuses on the one breach, right? We have a judgment. One contract. We have a judgment that's determined the damage calculations based upon the Cathay breach in October of 2012. But both — Your Honor, both the Fifth Circuit as well as the district court repeatedly mentioned that there were so many breaches, numerous breaches, as early as the NCR corporation, and that you can only secure damages on one breach. Well, it's just one thing for you to engage in discovery to calculate it, to collect the judgment you have. And that's what we have. But you're — I think if I hear you saying that what you were looking for are other breaches and grounds to file another lawsuit. Well, we know there are other breaches. That's been decided. The question is, is whether the company engaged in transfers that could be attacked, in dividends that could be attacked. And this is where the logic of Data Treasury completely crumbles. Because, one, they didn't object to producing discovery only after the Cathay bank license agreement in October 2012. That wasn't their objection. They used that as a fallback argument. But their — I'm not sure — you're not going to have the same kind of — it's not a bankruptcy matter of, you know, selling off assets, pending bankruptcy, bringing them back. These people may have spent the money profitably and threw it away, whatever they did. But it's gone. And unless you can — you're suggesting that you can somehow pull that money back. We don't even need to necessarily pull the money back, Your Honor. Fraudulent transfer law, especially actual fraudulent transfer law under the state of Texas, provides for a one-year discovery rule after finding out about transfers. Unlawful dividends are permitted to tolling provisions. Who's going to pay you for those? Where are you going — I guess I don't understand what you're — I still don't understand what you get by this discovery. The discovery that was provided to us after June 2011, this arbitrary date that they selected, they said, we're not going to give you anything prior to June 2011. But the documents after June 2011 show over $30 million of transfers to insiders and approximately over $17 million of dividends paid primarily to insiders. So who are we going to go after? The transferees, Judge. The insiders who decided to line their own pocket rather than to reserve our liability. The insiders who decided rather than to notify J.P. Morgan that it was entering into more favorable licensing terms, rather kept cashing J.P. Morgan's license payment check. We're going to go after the insider companies who received favorable transfers. So we have the right — we respectfully submit — What are the limitations out there that you face? There are no limitations, Judge. And that is because we don't — they decided, Data Treasury decided, we are not going to tell you or give you a single piece of paper prior to June 2011. So if in May of 2011, they transferred $150 million to their insiders, we don't know that right now. But as soon as they disclose those details and we have an ability to analyze those documents and that information, we'd have the right to bring a claim. And what we're suggesting to this Court and why we're asking this Court to reverse the discovery order is because my client should have the right to see that. My client should have the right to analyze that. My client should have the right to assert a claim if a claim exists and let them then attack those claims. And what's so disingenuous about what was argued to the district court — and mind you, Your Honors, this is the third district judge that was on the case. The first district judge retired. The second district judge recused himself. And this was the third district judge. We had a lot of briefing and conferences, and then ultimately the Court said, you know what, file a discovery motion on this point. The Court's rules were very limited in what could be filed. And the judge issued this very summary opinion. It doesn't even reference J.P. Morgan's papers. But it does reference, almost line by line, citations to Data Treasury's papers. And the disingenuous thing about that is Data Treasury came forth and said, as Judge Graves, as you asked me, well, isn't this judgment kind of predicated on Cathay Bank? And at the surface, you say, yes, the damages are calculated. But what Data Treasury didn't tell the district court is that it argued in its briefs to this Court that led to the 2016 affirmance of the judgment, Data Treasury affirmatively argued that it first breached the MFL back in January of 2006 with the NCR $2.85 million license agreement. And they argued that to the Fifth Circuit to say, you have to throw this judgment out that's based on Cathay. They had to pick one breach. They pick Cathay, throw it out, because it's a statute of limitations barred claim. Why, Data Treasury says? Because we first breached years ago. So when we look at what they're arguing, to this very court in the prior appeal, they're saying, we breached. We breached just months after we agreed with you. We didn't tell you about it. We kept taking your money. And now we're not going to give you any of the details of the claims. And the — But you picked the Cathay agreement, didn't you? J.P. Morgan's counsel, yes. Yes. Yes. They picked the Cathay bank agreement after, however, Judge Graves, after the court issued its 2014 liability ruling. The 2014 liability ruling dealt with the liability issue. It said the MFL provision is self-executing. And basically, Data Treasury, you have the obligation to notify J.P. Morgan. You have this refund obligation. And that took care of the liability side of the case. The judgment then came from a subsequent summary judgment motion in the 2015 ruling that talked about Cathay. And then the court actually denied summary judgment. And then the parties stipulated to judgment, based upon an amount, while reserving all of Data Treasury's rights. So — What discovery do you want? We want all the financials. They kept general ledgers. Documents from the — from them and what? Depositions of officers or what? Yes. Yes, Your Honor. So — so specifically, what — what we asked for, the core of what we asked for, were the general ledgers. We want the books and records of the company, which they had general ledgers that they gave us after June 2011. We want to see where money went. We know that close to $600 million was paid to this company as a result of these infringement lawsuits and license agreements. We want to see where the money went. And we also want to take a deposition of — of a corporate officer to — to authenticate and deal with those documents. Another key core part of the documents we're asking for are the board minutes. We've received board minutes and shareholder minutes after June 2011, but they won't give us a single page before. And anything in — after June 2011 that even references March 2011, they redacted. They won't give to us. And we respectfully submit that the designation of June 2011, the date that they say, we first found out, meaning Data Treasury first found out from J.P. Morgan, that you think you have a claim, when you wrote us the letter and said, hey, let me just remind you, have you entered into any agreements for — can you just confirm to us? They're saying that that should be the trigger date for discovery. And we respectfully submit that's arbitrary. It's — it's completely arbitrary, especially in light of the prior court rulings, the law of the case, which they're looking to just offend and ignore that the agreement was self — self-executing. So, Your Honor, we're asking for the financial records, the books and records, the general ledgers. It became relevant because they insisted on it. Say again, Your Honor? I said it became relevant when they insisted on it. In your mind, I don't understand. Well, that's right. And — and throughout the course of the underlying litigation, because that occurred in June 2011, the litigation was commenced, I believe, in November of 2012. Much discussion was going on between then. During the course of the litigation, many questions were asked about financial status, and they said not part of the case. We'll deal with it post-judgment. And once that judgment was entered, the requests were almost immediately sent, and we've been trying to get these documents ever since the judgment — the judgment has been entered. And when you look at the district court's order, the district court's order doesn't deal with any of this. It doesn't deal with the prior Fifth Circuit ruling. It doesn't deal with the 2014 or 15 district court rulings. It doesn't even go into any type of analysis of the discovery requests. It doesn't go into proportionality. It doesn't do any type of balancing test at all. It doesn't even reference any of the requests. So we respectfully submit that that order needs to be reversed, that that order is an abuse of discretion. What is the status of Data Treasury Corp. today? Data Treasury Corp. today, according to what it has told us, has suspended operations. It's not conducting any business. But we know that individuals that were involved in Data Treasury seem to be involved in numerous business endeavors with companies that had relationships with Data Treasury. Suspended business operations? That sounds like, well, I'm going to spend more time with my family kind of an explanation. It may be. We believe after its two main patents were invalidated by the Patent and Trademark Office, it ceased doing business. And that's actually a very important part of this timeline, Judge, because after June 2011, the company's patents were already under attack, and the company was basically in a wind-down phase. The majority of the revenue that it earned was pre-June 2011. The patents were running out. I mean, they had a — they really had a bird's nest on the ground. They had these patents, and they — when they ran out, they — unless they, in the meantime, had to come up with some other new business idea, they're pretty much out of business. Is that right? And that is right. And they did do that in connection with a number of related companies that have similar ownership that we're hoping to learn more about with the very discovery that we're seeking pre-June 2011, with various agreements that they entered into with these related companies that have similar ownership, but we've been precluded from doing so. But, Judge, even if it was a — even if it was a natural wind-down of this company, this district court opinion basically absolves Data Treasury from any wrongful conduct with respect to its finances pre-June 2011. So if — if it was — let's say it was negotiating the Cathay Bank license agreement in early 2011, and it came up with a plan that, hey, we're going to spirit out of this company, we're going to — we're going to make the company transfer as much cash out as we possibly can to avoid this J.P. Morgan creditor claim, because, again, it knew that it had this refund obligation to us. It insisted — there's a press release that was signed back in 05 that was released by It doesn't allow us any transparency. It doesn't allow us to find out where — What other business did this company have, other than the business generated by those patents? There were other patents that it either acquired or that it filed for, including things like biometrics and other types of technologies that it was pursuing and researching, and the various insiders of the company, according to our discovery, entered into — were controlling or operating businesses that were trying to develop this technology, and we just don't have the transparency to know if they've picked that up. We know various patents were transferred from Data Treasury, but we're — the bulk of the question, I should say — the bulk of the inquiry is, is really, you earned hundreds of millions of dollars. Where did the money go? And if the money was transferred out of the company, and there clearly was not an appropriate reserve for our claim, we have a claim. Texas law clearly says — Your Honor, I see that my time is up. If I may just finish this. You may. Thank you, Your Honor. Texas law clearly provides that our claim existed as of 05, when the licensing agreement was signed, and if they chose not to reserve, and they made decisions to transfer money out, then they may face liability. But what they shouldn't do, or be able to do, is to hide behind a discovery order to avoid that scrutiny. My client should have the right to do that analysis. Thank you, Your Honors. Thank you. Mr. Rupp. May it please the Court, counsel. The case before the Court today is a fairly garden-variety discovery dispute over post-judgment discovery, the kind of dispute that this Court gives broad discretion to the trial courts to resolve for the very reason that they tend to be very fact-intensive. They tend to involve disputes that are long-running before the Court, with which the lower courts have the most familiarity. In fact, other than maybe questions such as the credibility of witnesses or other similar types of matters, this is one of the areas in which this Court gives the widest leeway to district courts to make determinations on a day-to-day business, because these discovery disputes are the daily grist of a trial court's calendar. The appellant in this case is J.P. Morgan Chase, and JPMC is the largest bank in the United States, and it's the sixth-largest bank in the world. JPMC was represented below by lawyers from the tallest of the tall towers in New York, Skadden Arps. Measured by revenue, Skadden Arps is the second-largest firm in the United States, and it is the twelfth-largest law firm in the United States by number of attorneys. It employs some of the brightest minds that we have in our profession. Now why does that matter? It matters because the question that's presented in this appeal, at root, is whether JPMC today must live with the very astute and clever litigation strategy that it selected below, implemented, and deployed to its significant advantage. What was that strategy? The strategy was to cut off Data Treasury at the knees with respect to its statute of limitations defense by expressly, unambiguously, repeatedly, in writing, orally, at the district court, before a different panel of this court, over and over again, telling anyone that would listen that its liability case, not its damages case, its liability case for breach of contract against my client, Data Treasury, was premised on the October 2012 CAFE Bank license. Well, that may be, but they won on that score. They have a judgment, and they should be able to go after whatever resources are out there. One thing that I'm not completely clear of, and in terms of the most favored here license and favored nation provision, is the obligation, how you deal with the obligation, and how do you treat, and what calculates a lower rate in that, when you have expiring patents? In other words, I pay you $100,000, and you've got a patent for nine years, and then five years later, you've got four more years on that, and you take a license for $50,000. Is that what I'd be entitled under this arrangement, to recover that $50,000? In other words, how do you put into place, in play, in this calculations, a liability that the expiration dates of the patent, which is the source of the money? Those are excellent questions, Judge Higginbotham, and three years ago, I stood right here and argued those points to a different panel, and I lost, so maybe I'm not the best person to ask. But I will tell you that the way that case was resolved is that it was determined that Well, it's an interesting one, though, and it's one that we've spent a lot of time and effort and resources trying to answer before, and I convinced one of the three judges that I had the better argument, but unfortunately, it takes at least two. So Your Honor, the way that shook out, if you still would like to know the answer, is that what was determined was that it was up to JPMC, and it could pick and choose from all the different terms and all the different licenses which one it liked best and was automatically entitled to those. And it did that. It did that when it filed a motion for summary judgment in front of the district court after it already had in hand 60 licenses with a big, wide universe of choices from which it could elect and brought a motion for summary judgment on liability, not on the amount of affirmative defenses, that the one it wanted out of that whole universe was the October 2012 Cathay Bank license. I think it's important to tell the truth up here, and I just feel that this briefing and the oral argument that's been heard includes some dissembling, because it is crystal clear that it was liability that they were going for with respect to the Cathay Bank license. As the Court's well aware, the standard of review here is whether or not the district court used or based its decision on some arbitrary or clearly unreasonable basis. Well, I'm going to answer the argument that the company had a wasting asset, and they knew that, and they were generating a large revenue stream, so that you had a built-in economic incentive for the people receiving that to make use of that money now, not necessarily in investing it elsewhere and moving it in other ways, but they would argue that to avoid the liability that they know is out there, but that they haven't been honoring that Most Favored Nation Clause. Yes, and I want to speak, I think what Your Honor's question goes to a little bit is, is this fair? Are the equities of what's happening in this case fair or not? And when I listened to my opposing counsel's argument, that seemed to be the thrust of where he was going, that it's not fair what happened to us here. And throughout the briefing, throughout the proceedings below, there's been a lot of accusations leveled against my client, of course by implication, the lawyers that represented the client, that there was malfeasance and ulterior motives in not making those disclosures of the licenses to JPMorgan Chase during the time frame when those were being inked. But the bottom line is that JPMC and Data Treasury viewed that Most Favored Licensee Clause through a very different lens and had very different, I believe on both sides, earnestly and sincerely held differences about what it meant and what it required. And so there was no cover-up or, gee, let's get all the money out the door before they can get it type of situation here. And it's unfortunate that that allegation keeps getting made, because what Data Treasury believed was that unless it entered into a license that was for, with an equivalent megabank like JPMorgan Chase for an equivalent amount of use of its patented technology, that the Most Favored Licensee Clause didn't even come into play. Now, we lost that point. We lost that point, but it was earnestly held up until the time that we were told by this Court, a different panel of this Court, that's not the law. In a case of first impression, never before decided in this particular court or, for that matter, at least not in a clear fashion by any other. The thrust of my question is that if Data Treasury is looking at its obligation, where as a wasting asset, and hence their obligation of the Most Favored Nation is to be reduced, that that really is an argument that they've locked the incentive at that point, those years, to dissipate assets. So that was the context that I think that arises, but the other side of the coin is what is, what's magical about that date? Is it, it's not cost and expense, it's what is it? Which date, Your Honor? I'm sorry. The cutoff date for discovery. The discovery cutoff date? All right. All right. So the discovery cutoff date that the Court elected went back almost a year and a half before the Cathay Bank license, and I don't, the district court didn't tell us why it reached that determination, but it's because I believe that's what the applicable precedent says is an appropriate, in fact, is at the very far reaches of an appropriate look-back period to see what would be, what would be potentially a conveyance that might merit further review. And with respect to the Court's comment about the wasting nature of the asset, I think absolutely. Data Treasury had shareholders, and they wanted to make hay while the sun was shining and get as many licenses and as much money from those licenses as they possibly could. In addition, what ultimately killed Data Treasury was- I wanted to keep that money. Sure. Sure, naturally, but you know- I'm saying, if liability came, the question is when the awareness of liability and the exposure is the underlying incentive that, that's the only thing that comes to my mind that would authorize the extension of what's discovery period. To the extent that it makes a difference, the awareness by Data Treasury that there was a difference of opinion between the parties as to what that most favored licensee clause meant and required came about in the summer of 2011, which is how far back the District Court allowed for discovery to go to. Well, you know, I think if I were looking at this as a District Judge, I would, and that's what troubles me about all this, it sounds very much like it ought to be done by the District Court, and that's why we leave it down there. I would say, why don't you go down, let's proceed with that deadline, and then you come back and let me, and come back and tell me what you found, if anything, that would justify going further. That's one of the other ways of going at it, but we're not here to try to make out those kind of judgments in a pre-conference, in Chambers Conference, in Discovery Conference. Certainly, Your Honor. I guess the District Judge is not the magistrate, you're doing that now, or whomever. Because JPMC's appellate counsel doubled down on this idea that the Cathay Bank license was not the marker for liability in the case in its reply brief, I went back and dug through the record to find a few other what I think are relevant considerations that I'd like to bring to the Court's attention. For instance, we already told you about how in their motion for summary judgment, right there on the first page, they said, we're limiting ourselves to the Cathay Bank license. But they doubled down on that election in their reply brief as to their motion for summary judgment, and that's in the record on appeal at 6419-6431, and the entire reply brief premises their liability case on the Cathay license from the first page to the last. And then if anyone still could have had any doubt that that was the case, they also filed a response to a motion for partial summary judgment that we filed on that statute of limitations defense, and that's in the record on appeal at 5191-5210. And in that brief, this is what JPMC said about the Cathay license, quote, there is no question that JPMC's claim based on the 2012 Cathay license was asserted within the four-year statute of limitations applicable to breach of contract claims. And then they went on to say this, this court does not need to consider Data Treasury's motion for partial summary judgment regarding the statute of limitations because it expressly does not apply to the subsequent license containing the more favorable pricing term that JPMC seeks the benefit of in its motion for summary judgment. So what that means, Your Honors, is that when JPMC now comes along and it pretends to this court about the post-judgment discovery because its liability case was, in fact, premised on breaches earlier than 2012, it's simply not being straight with you. It's playing fast and loose with the facts. This case went all the way up to the brink of trial. Here's another way we know that they're not telling you the truth. They filed motions in limine asking the district court that was about to preside over the trial in this case to bar Data Treasury from even referring to or eliciting testimony about any license other than the October 2012 Cathay Bank license because it would be irrelevant because they'd penned their breach of contracts liability case to that October 2012 Cathay license. They said that we should not be permissibly able to argue or present at trial anything, quote, aside from limited facts needed to apply the Cathay formula. And in the transcript of their hearing before Judge Schneider, one of the three district court judges whom they repeatedly maligned throughout their briefing and cast aspersions on because they had the temerity to listen to JPMC when it was telling them that it was to Judge Schneider that, quote, Data Treasury's lawyer does not argue the Cathay license, which is the only one in issue here, end quote. And that's on the record on appeal from 611 to 648, that particular transcript. Another point I think bears noting. In a breach of contracts case, the damages analysis is necessarily going to flow from the breach, right? So liability leads to damages. JPMC's counsel finally gets around to mentioning the Cathay bank license for the first time in its opening brief to this court, 20 pages into the 23 pages of factual and procedural material in the opening brief. And when it does, it says that the Cathay license, quote, was used as the benchmark for JPMC's damages award. Well, that's true, but it's also unremarkable because they pinned the liability case to the 2012 Cathay license, and so naturally contract damages are going to flow from that liability. And JPMC does not explain to this court why, if the breach of liability basis that it had selected had been something other than the Cathay license, it wouldn't have been obvious error for the parties in the district court below to go building the damages award on the Cathay bank license. In fact, the record tells us that there were licenses for much less than the $250,000 Cathay bank license. There was one to Patriot Bank for — What difference does it make now? You got the — it's just purely a question. You got a judgment, and it's been upheld, and that's — and now the question is enforcing the judgment. Well, it makes a difference, Your Honor, because if they're right, then there's a decent argument that the district court got it wrong in assessing the scope of discovery, post-judgment discovery that ought to be permitted. Well, why so? Because if, indeed, it were not October 2012 that was the linchpin of the breach of contract case — But the question is just how much time do they need reasonably to effectuate discovery, to enforce the judgment that's before us, period? Now, all these other people and these other entities, none of that seems to me to bear on this. They're entitled or not to go forward. That's — the focus and why they sued one, selected one, not all the others, to impose their liability, today where we are now, I just don't see the relevance of that. They do not need a day more than the one year and four months-odd look-back period that the district court gave them, and I'd submit that the district court would have been well within its discretion to have given them a heck of a lot less. Are there any other questions from Your Honors? Otherwise, I'll take my seat. Thank you. Thank you, Counsel. Rebuttal. Thank you, Your Honors. Just to address the one question from Your Honor about the lump sum, the Fifth Circuit actually spoke to the issue about — On page 10. And basically said — the parties said it's a basically lump sum, and if you enter into a more favorable lump sum. So I just — just wanted to address that. But with respect to counsel's argument, it — it just does not align with the court rulings of the district court, the prior district court rulings of 2014 and 2015. It specifically says in the rulings, for example, on footnote 4 of the 2015 ruling, that after entering into the JPMC license agreement, DTC, Data Treasury, licenses patents to more than 60 additional entities. On page 6, it — it says that it's interpreting the MFL clause to mean that there's no limit on what type of term can be instituted, and goes on to discuss the clause. The 2015 district court ruling dealt with the liability. Then the — the — the trial had to be scheduled because there was no determination as to damages. And ultimately, the party stipulated, as mentioned. But in the Fifth Circuit ruling, you have on — on page 21, the court cited that Data Treasury seems to be already arguing that the MFL clause gave JPMC a single right to enforce, no matter how many times Data Treasury breached. Data Treasury points out that it first breached the clause more than four years ago, when it entered into its first license with a third party on more favorable terms than with JPMC. And the Fifth Circuit said, that's nonsense. You never even provided sufficient notice of its earlier — of your earlier breaches, as required by the clause. It goes on on page 22 to explain that Data Treasury claims that it detrimentally relied on the silence of the bank regarding its intent to sue when it used J.P. Morgan's final payment to pay its ordinary operating expenses. And then the Court went on to say, that's nonsense, too, because Data Treasury CEO testified that the company would have paid its operating expenses if it had not no matter what. The question of how — Your Honor, I see my time is up. If I may just complete — complete one last point. Very briefly. Thank you, Your Honor. All right. The whole argument falls. Why? Even if they pick June 2011, or even if they pick Cathay Bank, the fraudulent transfer laws, just those alone, allow for, in Texas, a four-year look-back. Counsel stands and says a year and four months back from Cathay Bank is sufficient. But I had a right to go back four years because I had an open claim. I had a right to look at that. So under counsel's own argument, it fails. The Court never addressed this. The district court just blindly accepted, unfortunately, based on the representations made, which we feel were contradicted by the record. Your Honor, I say thank you all for your time and courtesy. Thank you, counsel. The Court will take this matter under advisement.